IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MEMDATA, LLC, a Texas limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>INTERMOINTAIN HEALTH CARE, INC., a Utah corporation, and IHC HEALTH SERVICES, INC., a Utah corporation,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br><br>Case No. 2:08-CV-190 TS |

This matter is before the Court on Defendants' Motion for Summary Judgment. The underlying action is contractual in nature. For the reasons discussed below, the Motion will be denied.

**I. Background**

Defendants Intermountain Healthcare, Inc. and IHC Health Services, Inc. ("IHC") are non-profit corporations owning hospitals and medical facilities throughout Utah and Idaho. Plaintiff MEMdata ("MEMdata") provides medical facilities with capital equipment purchasing

1

services designed to reduce costs.

This breach of contract action surrounds a one-page performer agreement. Under this agreement, Plaintiff's customers obtain price quotes on equipment from various equipment vendors and submit the received quotes to Plaintiff.[1] Plaintiff then tries to obtain a lower price for the same equipment.[2] If the customer chooses to purchase from one of the lower priced vendors negotiated by Plaintiff, Plaintiff receives a percentage of the savings.[3] Savings are calculated by comparing the customer's quoted equipment prices with the final prices paid for equipment after processing through Plaintiff's service.[4] However, "under the Performer Agreement, [MEMdata] leaves complete authority and control of vendor selection and award decisions with the client."[5]

The agreement states:

CLIENT RESPONSIBILITIES: Client shall submit all of its most responsive proposals/bids/quotes (which Client's Internal procedures define as 'capital equipment') for MEMdata review and allow five (5) business days for MEMdata to complete its analysis. Upon receipt of the MEMdata Savings Report, Client warrants that it shall evaluate each proposal prior to finalizing the purchasing decision and issuing a purchase order.[6]

---

[1] Docket No. 1 at ¶ 6.

[2] *Id.* at ¶ 7.

[3] *Id.* at ¶ 10.

[4] *Id.*

[5] Plaintiff's Answers, Responses and Objections to Defendants' First Set of Requests for Admission, Interrogatories, and Requests for Production of Documents, Docket No. 69, Ex. 2, at ¶ 4.

[6] Memo. in Support, Docket No. 69, Ex. 3.

The agreement was originally signed in January of 2004, a new agreement was substituted in 2005, but the parties agree the terms of the 2005 agreement are, in relevant part, identical to the terms of the 2004 agreement.[7]

Plaintiff alleges that within the first eight weeks of the agreement it identified and negotiated $1,630,669 in cost reductions for Defendants. Defendants state that at no point during the parties contractual relationship did they send 100% of their capital equipment purchase to Plaintiff.[8] During the annual review of 2004, Plaintiff stated "an estimated 17% of actual IHC equipment purchases were reviewed. Approximately $11,620,000 in additional savings potentially could have been identified in 2004."[9] Defendants allege that in the years following the first year it sent even smaller percentages to Plaintiff.

Defendants allege that prior to signing the agreement, they were told "there is no cost to participate, no minimum volume requirements."[10] In response to a request for admissions, Plaintiff stated, "Intermountain was under no obligation to award the business to any other vendor than that which it preferred."[11] Defendants allege that Plaintiff repeatedly recognized that Defendants were not using Plaintiff for 100% of its purchases.[12] In an email from Plaintiff's

---

[7]Docket No. 69 at ¶ 6.

[8]*Id*. at ¶ 15.

[9]*Id*. at ¶ 18.

[10]*Id*. at ¶ 10.

[11]*Id*. at ¶ 12.

[12]*Id*. at ¶ 19.

CEO to Defendants, Plaintiff asked "[h]ow can we ensure that all capital projects, or at least most, are sent to us and the savings potential which we know is out there is realized?"[13] During the deposition of Plaintiff's CEO, he stated that he had not notified Defendants of their breach because those types of communications typically "lead [immediately] to a cancellation of that [business] relationship."[14] Plaintiff's sales representative responsible for Defendants testified that one of the reasons Plaintiff refrained from notifying Defendants they were in breach was because "the contract had a thirty day out clause and if I jumped up and down in front of somebody's desk, before I could get out the door [Defendants] would write the cancellation letter for Memdata."[15]

Plaintiff alleges that even as it produced "mounting cost reductions," approximating $19,401,915.65, Defendants "inexplicably began a purposeful and systematic process" of breaching the agreements, resulting in obstruction of Plaintiff's performance and financial detriment to both parties. Plaintiff alleges Defendants breached both the contract and the covenant of good faith and fair dealing by withholding an estimated 1,360 individual equipment purchases over an approximate four year period.

## II. Standard of Review

Summary judgment is proper if the moving party can demonstrate that there is no genuine

---

[13]*Id*. at ¶ 17.

[14]*Id*. at ¶ 20.

[15]*Id*. at ¶ 21.

issue of material fact and it is entitled to judgment as a matter of law.[16]  The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party.[17]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[18]  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials in his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial, if he does not so respond, summary judgment, if appropriate, shall be entered against him."[19]

### III. Discussion

Defendants argue that the agreement is unambiguous and did not obligate them to submit all or any specific portion of their capital acquisition projects to Plaintiff.  Alternatively, Defendants argue that any ambiguity that may exist in the agreement renders it unenforceable as a matter of law.  Defendants also argue that even if the agreement did obligate them to send "some or all" of their capital equipment purchase proposals to Plaintiff for review, because Plaintiff undisputably did not raise the issue for years and deliberately chose not to notify

---

[16]*See* FED. R. CIV. P. 56(c).

[17]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[18]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[19]FED. R. CIV. P. 56(e)(2).

Defendants they were in breach, it has waived its rights to enforce that provision and is therefore estopped from bringing such claim. Last, Defendants argue that the damages claimed by Plaintiff are too speculative to permit recovery.

Plaintiff counters that the contract unambiguously required Defendants to submit all of its most responsive capital equipment bids to Plaintiff. In the alternative, Plaintiff argues that the contract was at least ambiguous. Plaintiff also argues that summary judgment is inappropriate because Defendants, in addition to breaching the contract, also breached the covenant of good faith and fair dealing. Plaintiff then argues that it did not waive its right to bring this action, should not be estopped from bringing this action and that waiver is intensely fact based, making a waiver determination inappropriate for summary judgment.

A. Contractual Ambiguity

Courts look to the "language of the contract to determine its meaning and the intent of the contracting parties."[20] Each contract provision is considered "in relation to all of the others, with a view toward giving effect to all and ignoring none."[21] "A contractual term or provision is ambiguous 'if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.'"[22] In *Ward v. Intermountain Farmers Ass'n*,[23] the Supreme Court of Utah identified two different types of ambiguity: (1)

---

[20] *Flores v. Earnshaw*, 209 P.3d 428, 431 (Utah Ct. App. 2009).

[21] *Id.*

[22] *Daines v. Vincent*, 190 P.3d 1269, 1275 (Utah 2008) (quoting *WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002)).

[23] 907 P.2d 264 (Utah 1995).

facial ambiguity with regard to the language of the contract and (2) ambiguity with regard to the intent of the contracting parties.[24] The *Ward* court then laid out a two-part test for determining ambiguity: first, "when determining whether a contract is ambiguous, any relevant evidence must be considered;"[25] second, after consideration of relevant and credible evidence of contrary interpretations, "the judge must ensure that 'the interpretations contended for are reasonably supported by the language of the contract.'"[26] However, in 2008, the Supreme Court of Utah clarified, and somewhat narrowed, its holding in *Ward*, stating that "a finding of ambiguity after review of relevant, extrinsic evidence is appropriate only when 'reasonably supported by the language of the contract.'"[27] A court must first find some facial ambiguity before examining any parole evidence. Further, the determination of intent through parole evidence presents a question of fact.[28] Any evaluation of parole evidence as to the existence of facial ambiguity is "ultimately circumscribed by the language of the agreement."[29] Determining "what the writing means begins and ends with the language of the contract."[30]

"It is fundamental that a meeting of the minds on the integral features of an agreement is

---

[24]*Daines*, 190 P.3d at 1276 (citing *Ward*, 907 P.3d at 268).

[25]*Id*. (citing *Ward*, 907 P.2d at 268).

[26]*Id*. (quoting *Ward*, 907 P.2d at 268).

[27]*Id*.

[28]*Flores,* 209 P.3d at 431.

[29]*Id*. at 433 (citing *Daines*, 190 P.3d at 1276).

[30]*Daines*, 190 P.3d at 1277.

7

essential to the formation of a contract. An agreement cannot be enforced if its terms are indefinite."[31] "[A]lthough an agreement is uncertain or incomplete in some respects, its specific enforcement may nevertheless be decreed where the uncertainty relates to matters which the law makes certain or complete by presumption, rule or custom and usage."[32]

As previously noted, the disputed provision states the following: "Client shall submit all of its most responsive proposals/bids/quotes (which Client's Internal procedures define as 'capital equipment') for MEMdata review and allow five (5) business days for MEMdata to complete its analysis." Plaintiff argues the language "shall submit all" is unambiguous because "shall" is a mandatory term meaning must, and "all" means the whole amount. Therefore, according to Plaintiff, the contract clearly demands that Defendants must submit all their bids to them. However, Plaintiff seems to conveniently ignore the second part of the phrase "its most responsive proposals/bids/quotes." Beyond stating that IHC's own internal procedures on the definition of capital equipment control, there is no definition or guidance as to the meaning of "most responsive" elsewhere in the contract. The Court finds that this clause qualifies the mandatory provision.

Because the mandatory term is qualified by an undefined term, the Court finds the clause "most responsive" is facially ambiguous. This position is supported by the parties' statements and behaviors. Plaintiff, in an annual report, stated that only 17% of Defendants' equipment purchases were sent to them. Further Plaintiff sent Defendants an email acknowledging their

---

[31]*Neilsen v. Gold's Gym*, 78 P.3d 600, 602 (Utah 2003).

[32]*Reed v. Alvey*, 610 P.2d 1374, 1378 (Utah 1980).

interest in receiving more of Defendants business.

Reading the contract as a whole and construing each provision in light of the others leads to the same conclusion. Paragraph three of the contract, which outlines Plaintiff's responsibilities, states: "MEMdata shall provide capital equipment cost containment services on all equipment purchase events submitted by Client."[33] This provision of the contract discusses Plaintiff's responsibilities with respect to the purchases submitted to it, as opposed to all of the client's purchases. Paragraph seven states "Client hereby authorizes MEMdata to serve as an authorized agent for Client only as related to the capital equipment projects Client assigns to MEMdata." Again, this provision limits Plaintiff as an authorized agent to the projects assigned to it. If all the projects necessarily had to be assigned to Plaintiff, there would be no reason to limit the scope of Plaintiff's authority according to what projects a client chooses to assign.

Even though the Court finds the contract does not unambiguously require IHC to submit all of its capital equipment purchases to MEMdata, it does not simultaneously find that the contract unambiguously gives Defendants the right to freely pick and choose, at will, what projects to send to Plaintiff. However, the Court need not examine parole evidence to determine the parties intent at this time because reconciling ambiguity is fact based and, therefore, is a task for the jury.[34] Accordingly, without a detailed examination of extrinsic evidence, including presumption, custom or usage, the Court is unable to determine if the contract fails based on the uncertain terms.

---

[33]Docket No. 69, Ex. 3, at ¶ 3.

[34]*Flores*, 209 P.3d at 431.

B. Estoppel and Waiver

Defendants also argue that Plaintiff waived its right to enforce any alleged obligation of Defendants to submit all capital projects to Plaintiff.

"To waive a right, there must be an existing right, benefit, or advantage; knowledge of its existence; and an intention to relinquish it."[35] "The party's actions or conduct must evince unequivocally an intent to waive, or must be inconsistent with any other intent."[36] "Waiver may be express or implied, but it must be distinctly made,"[37] and "will not be implied from doubtful acts."[38] Waiver is a fact-dependent question.[39] Although waiver may be decided as a matter of law if the evidence is so conclusive no reasonable trier of fact could conclude the plaintiff did (or did not) intend to relinquish a known right,[40] "[b]ecause waiver is [also] intensely fact-dependent, district courts should exercise care when granting summary judgment on this issue."[41]

Estoppel "is a doctrine which precludes parties from asserting their rights where their actions or conduct render it inequitable to allow them to assert those rights."[42] "The elements of

---

[35] *Clarke v. Am. Concepts Ins. Co.*, 758 P.2d 470, 473 (Utah Ct. App. 1988).

[36] *Barnes v. Wood*, 750 P.2d 1226, 1230 (Utah Ct. App. 1988).

[37] *IHC Health Services, Inc. v. D & K Management, Inc.*, 196 P.3d 588, 594 (Utah 2008).

[38] *Jensen v. IHC Hosps., Inc.*, 82 P.3d 1076, 1094 (Utah 2003) (citing 28 Am. Jur. 2d Estoppel and Waiver § 160, at 845 (1966)).

[39] *D & K Management, Inc.*, 196 P.3d at 594.

[40] *Id.* at 595.

[41] *Id.* at 594.

[42] *Hunter v. Hunter*, 669 P.2d 430, 432 (Utah 1983).

estoppel are: conduct by one party which leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct."[43]

In arguing both that Plaintiff waived its right to bring these claims and should be estopped from repudiating its earlier claim, Defendants introduced evidence that MEMdata deliberately refrained from informing IHC that the parties' contract required IHC to send all of its capital equipment purchases to MEMdata for review.[44] As already discussed, Defendants submitted a deposition of Plaintiff's CEO and of the sales associate in charge of Defendants' account. Both statements indicate that Plaintiff refrained from mentioning any breach for fear of losing Defendants business through cancellation of the contract. Defendants argue Plaintiff should be estopped from enforcing this contractual obligation because its conduct allowed Defendants to proceed with the parties' relationship "under the impression that it was acting in accordance with the agreement, while Plaintiff was secretly accruing millions of dollars in damages."[45]

However, Plaintiff has introduced evidence showing that, in other situations, its personnel did remind Defendants' officials about their contractual obligations. Specifically, Plaintiff has introduced two emails from Plaintiff's CEO to Defendants' chief purchasing officer. In the first, Plaintiff stated, "[o]ur agreement does call for utilization of MEMdata for all capital purchases

---

[43] *Scheller v. Dixie Six Corp.*, 753 P.2d 971, 973 (Utah Ct. App. 1988) (citations omitted).

[44] Mem. in Supp., Docket No. 69 at 20.

[45] Mem. in Supp., Docket No. 69 at 22.

11

under the pure performance-based agreement."[46] In the second, Plaintiff stated, "[o]ur agreement is unambiguous in that it requires the client to send all capital equipment for processing."[47] Based solely on this evidence, Plaintiff has neither intentionally waived the right to bring these claims nor is Plaintiff attempting to repudiate earlier conduct.

Because the facts introduced by the parties support opposing views, summary judgment on this issue is not appropriate.

C. Speculative Damages

Even if the Court were to find the contract to unambiguously mandate that Defendants submit all equipment bids to Plaintiff, Defendants argue that Plaintiffs request for damages is too speculative to support a breach of contract claim. Plaintiff concedes it carries the burden of proof of damages but that it is only required to do so with reasonable certainty, not absolute precision.[48] Reasonable certainty means that "reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered."[49] "Damages are not to be denied simply because they cannot be ascertained with exactness. If a reasonable basis of calculation is afforded, it is sufficient although the result is only approximate."

Plaintiff alleges that under the terms of the contract as performed by both parties, it received $353,471.39 in profit. It argues, therefore, that because the contract was profitable, a

---

[46]Mem. in Opp., Docket No. 76, Ex. 13.

[47]Mem. in Opp., Docket No. 76, Ex. 14.

[48]*Kilpatrick v. Wiley, Rein & Fielding*, 37 P.3d 1130, 1146 (Utah 2001).

[49]*Id*. (internal citations omitted).

breach of the contract would necessarily result in lost profits.  Consequently, even though it may be unable to establish the precise amount of lost profit damages it, argues it has sufficiently shown, and that a jury could reasonable find, it suffered damage.[50]

Additionally, Plaintiff's damage model is based on objective data, including the 277 capital equipment projects submitted to it, the actual savings achieved on those projects submitted, and Defendants' records reflecting purchases not sent to Plaintiff.  Because damage calculations are always somewhat uncertain, the Court finds Plaintiff has sufficiently introduced evidence as to the damages it suffered.[51]

### IV. Conclusion

Because the Court finds a portion of the contested language is at least partially ambiguous, it is not clear, as a matter of law, that Defendants did not breached the contract. Further, the parties have submitted conflicting evidence regarding the course of conduct in regards to waiver and estoppel, and Plaintiff has established it suffered damages.  Therefore, summary judgment is inappropriate.

Based on the above, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 68) is

---

[50]*See Canyon Country Store*, 781 P.2d 414, 419 (Utah 1989); *Cooks Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1165 (Utah 1983).

[51]*Terry v. Panek*, 631 P.2d 896, 898 (1981); *see also Firkins v. Ruegner*, 213 .3d 895, 899 (Utah Ct. App. 2009) (quoting *Sampson v. Richins*, 770 P.2d 998, 1007 (Utah Ct. App. 1989) ("Although an award of damages based only on speculation cannot be upheld, it is generally recognized that some degree of uncertainty in the evidence of damages will not suffice to relieve a defendant from recompensing a wronged plaintiff.").

DENIED.

DATED April 15, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge