IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MEMDATA, LLC, a Texas limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>INTERMOUNTAIN HEALTHCARE, INC., a Utah corporation, and IHC HEALTH SERVICES, INC., a Utah corporation,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO EXCLUDE DR. HAL SINGER AND DR. GARY KONRAD<br><br><br><br>Case No. 2:08-CV-190 TS |

This matter is before the Court on Defendants two Motions to Exclude the Expert Testimony of Dr. Hal Singer and Dr. Gary Konrad.

**I. Background**

Defendants Intermountain Healthcare, Inc. and IHC Health Services, Inc. ("IHC") are non-profit corporations owning hospitals and medical facilities throughout Utah and Idaho. Plaintiff MEMdata ("MEMdata") provides medical facilities with capital equipment purchasing services designed to reduce costs.

1

This breach of contract action surrounds a one-page performer agreement. Under this agreement, Plaintiff's customers obtain price quotes on equipment from various equipment vendors and submit the received quotes to Plaintiff.[1] Plaintiff then tries to obtain a lower price for the same equipment.[2] If the customer chooses to purchase from one of the lower priced vendors negotiated by Plaintiff, Plaintiff receives a percentage of the savings.[3] Savings are calculated by comparing the customer's quoted equipment prices with the final prices paid for equipment after processing through Plaintiff's service.[4]

In addition to the agreement Defendants signed with Plaintiff, Defendants also had a contract with their sister company AmeriNet. AmeriNet is a group purchasing organization ("GPO") partially owned by Defendants.

Plaintiff alleges one cause of action: breach of contract and covenant of good faith and fair dealing.

## II. Discussion

A. Daubert

Fed.R.Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

---

[1] Docket No. 1 at ¶ 6.

[2] *Id*. at ¶ 7.

[3] *Id*. at ¶ 10.

[4] *Id*.

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals Inc.*[5] and *Kumho Tire Co., Ltd. v. Carmichael*,[6] the Supreme Court interpreted the requirements of Rule 702. "*Daubert* requires a trial judge to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"[7] "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."[8] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[9] "In applying Rule 702, the trial court has the responsibility of acting as a gatekeeper."[10] "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[11]

"The Supreme Court has provided some guidance for the task of determining scientific

---

[5]509 U.S. 579 (1993).

[6]526 U.S. 137 (1999).

[7]*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1163 (10th Cir. 2000) (quoting *Daubert*, 509 U.S. at 589).

[8]*Daubert*, 509 U.S. at 591.

[9]FED. R. EVID. 401.

[10]*In re Breast Implant Litigation*, 11 F.Supp. 2d 1217, 1222 (D. Colo. 1998).

[11]*Daubert*, 509 U.S. at 592.

validity."[12]  "This inquiry is 'a flexible one,' not governed by a 'definitive checklist or test.'"[13] Some factors to consider are whether the expert's theory or technique: (1) can be (and has been) tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error with standards controlling the technique's operation; and (4) enjoys widespread acceptance in the relevant scientific community.[14]

"*Kumho Tire* establishes that the 'gatekeeping' requirement set forth in *Daubert* 'applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.'"[15]  "The object of that requirement 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"[16]

B. Dr. Singer

In Dr. Singer's report, he explains that he was asked to "assess from an economic perspective the relationship between GPOs and hospitals and the associated agency problems."[17] Dr. Singer categorizes and summarizes his findings as follows: first, he presents an overview of

---

[12]*In re Breast Implant Litigation*, 11 F.Supp. 2d at 1223.

[13]*Atlantic Richfield*, 226 F.3d at 1163 (quoting *Daubert*, 509 U.S. at 593).

[14]*Id*.

[15]*Id*. (quoting *Kumho Tire*, 526 U.S. at 141) (citation omitted).

[16]*Id*. (quoting *Kumho Tire*, 526 U.S. at 152).

[17]Docket No. 71, Ex. 2 at ¶ 5.

4

medical supply purchasing; he then explains the "principal-agent" problem in the medical supply industry and the "perverse incentives" the system creates along with the lower quality and higher prices the model produces; next, he applies the agency problem to the current case. He continues to discuss the ways that Defendants allegedly interfered with Plaintiff's ability to perform its contractual duties through its protection of AmeriNet's administrative fee revenue and its instructions limiting the number of vendors from which Plaintiff could obtain price quotes. Finally, Dr. Singer concludes that "AmeriNet cannot and could not be counted on to act in the best interests of its principals–namely, its member hospitals generally and IHC in particular."[18]

>It its expert disclosures, Plaintiff stated that Dr. Singer

>>will testify regarding the relationship between GPOs and hospitals and the associated agency problems arising therefrom. In particular, Dr. Singer will testify concerning the relationship between Defendants and Amerinet, a national GPO with over 14,000 members; the effect of Amerinet's administration fee revenue on the cost and quality of Defendants' capital equipment purchases; Defendants' interference with Plaintiff's contractual duties under the parties' agreements; and how Defendants' utilization of vendor contracts, including sole source contracts, was contrary to the competitive bid process called for by the parties' agreements.[19]

Defendants do not question Dr. Singer's ability or qualifications as an expert, nor do they object to the substance of his report. Instead, Defendants argue that Dr. Singer's expert testimony is not relevant because it does not relate to a fact in issue because Plaintiff's only cause of action is a

---

[18]Docket No. 71, Ex. 2, ¶ 10.

[19]*Id.*, Ex. 1., at 2.

breach of contract claim.[20] Defendants argue Dr. Singer's report is neither related to that breach of contract claim nor to the relief Plaintiff seeks.

In opposition Plaintiff argues that it alleges Defendants breached the contract in three ways: 1) by not submitting all of their most responsive bids for capital equipment to Plaintiff; (2) by failing to evaluate each of Plaintiff's capital equipment proposals prior to finalizing the purchasing decision and issuing a purchase order and; (3) by violating the implied covenant of good faith and fair dealing. Plaintiff further argues that Defendants violated the covenant of good faith and fair dealing by impairing Plaintiff's ability to perform and secure the fruits of the contract by entering into anti-competitive vendor agreements or otherwise interfering with Plaintiff's ability to explore and secure all competitive bids, and failing to exercise discretion to not purchase the lower priced product Plaintiff procured in an objectively reasonable manner. Plaintiff argues, therefore, that Dr. Singer's testimony goes directly to these theories as his testimony and report explain the anti-competitive nature of GPO's which Defendants were not only a part of, but also partly owned. Plaintiff also argues that Dr. Singer's testimony and explanation of GPOs is relevant to show motive.

"To prevail on [a] claim for breach of contract, [a plaintiff] must show (1) the existence of a contract; (2) a breach or failure to perform; and (3) resulting damages."[21] "A claim for breach of the implied covenant of good faith and fair dealing . . . is based on judicially

---

[20]Even though the sole cause of action is breach of contract, the Third Amended Complaint repeatedly alleges "an anticompetitive contracting scheme."

[21]*King v. Nevada Elec. Inv. Co.*, 893 F. Supp. 1006, 1018 (D. Utah 1994).

recognized duties not found within the four corners of the contract. These duties, unlike the duties expressly stated in the contract, are not subject to alteration by the parties."[22] "[B]y law, good faith and fair dealing are implied terms of every contract."[23] "They exist whenever a contract is entered and are imposed on the parties consistent with the agreed common purpose of the contract."[24]

Although Defendants might be correct in asserting that Dr. Singer's testimony is not related to the alleged breach of any of the express terms of the agreement, the Court finds it is related to the implied covenant of good faith and fair dealing term. Therefore, his testimony is relevant and will not be excluded.

C. Dr. Konrad

Defendants argue that Dr. Konrad's damages testimony should be excluded because it is not based on reliable data, principles or methods as required by Rule 702. Dr. Konrad admits that he was given the data he used and did not make any decisions regarding what data should be included or left out of his damages calculations. Defendants take specific issue with the average generated savings because they allege Dr. Konrad did not take into account that Defendants had the ability to, and often did, elect to purchase products other than the lowest priced option secured by Plaintiff. Additionally, in calculating Plaintiff's costs, Dr. Konrad was unable to explain certain discrepancies during his deposition between Plaintiff's financial statement and

---

[22] *Christiansen v. Farmers Ins. Exch.*, 116 P.3d 259, 261-62 (Utah 2005).

[23] *Peterson & Simpson v. IHC Health Services, Inc.*, 217 P.3d 716, 723 (Utah 2009).

[24] *Id.* (citing *Christiansen*, 116 P.3d at 262) (internal citations omitted).

7

the information provided to him upon which his analysis was based. Moreover, Defendants argue that Dr. Konrad failed to consider whether the costs avoided by Defendants not submitting all proposals to Plaintiff should have been taken into consideration in the damages calculation.

Plaintiff argues that Dr. Konrad plays a "very limited" role in the proof it plans to present. Plaintiff states that Dr. Konrad will simply provide the jury with a methodology for estimating its lost profits. Plaintiff states that during his testimony Dr. Konrad will "clearly indicate" to the jury that the numbers are factual assumptions upon which his opinion is based.

The Court finds generally that the methodology used by Dr. Konrad to be acceptable. It appears that Dr. Konrad looked at the actual savings percentage for the projects submitted to Plaintiff and applied that percentage to the equipment purchases not sent to Plaintiff to determine the total cost savings Plaintiff "probably would have achieved." Next, Dr. Konrad multiplied the cost savings by Plaintiff's 32% fee. Finally, Dr. Konrad calculated Plaintiff's costs and deducted those from the lost revenues. There is nothing unreliable about this method on its face. However, the Court is concerned by the actual figures employed by Dr. Konrad to reach his damages opinion. Defendants were not obligated and in fact did not choose to purchase the lowest price option for every piece of equipment. This alters the average savings calculation.

Plaintiff argues that Dr. Konrad's role was to estimate its profits if things had gone differently and argues that this task is impossible to do with 100% certainty. Additionally, because their theory is that Defendants were required to submit more capital equipment purchases to it than Defendants actually did, that their baseline and percentages in terms of a damages calculation are correct. Moreover, Plaintiff argues that the average costs savings

percentage included situations in which Plaintiff did not locate a cheaper alternative, Defendants elected not to purchase the cheaper alternative, or the cost savings was less than 6.435%, and is therefore a reliable measure.[25] Although these rebuttals seem persuasive, their credibility is undermined by the fact that these statements came in the form of rebuttal from Mr. Yancy, the Plaintiff's CEO, not Dr. Konrad.[26] Further, Dr. Konrad was given a list of capital equipment by Plaintiff, he did not examine the list to determine if every item on the list qualified as capital equipment.[27] This would further alter the average costs savings.

Plaintiff argues that it is permissible for an expert witness to base his opinions on hypothetical or assumed facts, so long as those underlying assumed facts are established in the record. Plaintiff further states that it will be made clear to the jury that Dr. Konrad's opinions are based on assumptions as to how the jury will resolve the underlying factual disputes, so the jury will be able to weigh his testimony and adjust its reliance on it accordingly. Plaintiff also disputes the statement that Dr. Conrad "did no analysis of what Kristi Yancy included as a variable expense" because they state that Yancy worked "at Konrad's instruction and under his supervision."[28] Plaintiff submits that Yancy was instructed to include costs when in doubt, and that the over inclusion results in lower damages. Plaintiff also disputes the avoided cost argument based on the fact that Defendants have not submitted evidence that there were any

---

[25] Docket No. 87 at 14.

[26] *Id*.

[27] Plaintiff asserts that the list it provided to Dr. Konrad was created based on a list Defendants submitted to it.

[28] Docket No. 87 at 15.

9

specific avoided costs.  Last, Plaintiff argues that the reliability of facts, assumptions, and data Dr. Konrad relied on can be fully explored in cross-examination.

Although the Court does not find Dr. Konrad's opinions to be perfect, "[t]he grounds for [an] expert's opinion merely have to be good, they do not have to be perfect."[29]  Additionally, the Court finds that his testimony, and method of calculating damages, if any, will be helpful to the jury.  The Court finds that Defendants' arguments go to the weight of his testimony, not its admissibility.  The Court notes again its concern with the numbers used in Dr. Konrad's calculations, however, the Court finds this is a matter better left for cross-examination.

### III. Conclusion

Based on the above it is hereby

ORDERED that Defendants' Motion to Exclude the Expert Testimony of Dr. Hal Singer (Docket No. 70) is DENIED.  It is further

ORDERED that Defendants' Motion to Exclude the Expert Testimony of Gary D. Konrad (Docket No. 72) is DENIED.

DATED   April 29, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge

---

[29] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743-44 (3d Cir. 1994), *cert denied*, 513 U.S. 1190 (1995).